FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.
JAN 18 2022
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-00024 |
| v. | ) | |
| | ) | |
| MELISSA ANN GOODWIN | ) | 18 U.S.C. § 1343 |

# INFORMATION

### COUNT ONE

THE UNITED STATES ATTORNEY CHARGES:

At all times material to this Information:

1. The T.J. Martell Foundation for Cancer Research ("the Foundation"), based in Nashville, Tennessee, was the music industry's leading foundation that funds innovative medical research focused on finding treatments and cures for cancer. The Foundation raises money for cancer research by soliciting in-kind donations from celebrities and then auctioning off those donations for a profit.

2. **MELISSA ANN GOODWIN** was an employee of the Foundation from 2005 until July 2020. **GOODWIN** was employed in various capacities. Beginning in approximately June 2011, **GOODWIN** managed and oversaw the financial operations of the entire Foundation and reported directly to the CEO. From 2018 until July 2020, she was the Executive Vice President and General Manager. **GOODWIN**'s duties included: working with staff to organize and execute Foundation events; maintaining the Foundation's national budget; procuring various insurance policies for the Foundation; being the point-person with the Foundation's accounting firm; handling payroll; and establishing and procuring contracts for the Foundation.

3. In its fundraising efforts, the Foundation primarily relied on donated items, but occasionally auctioned items on a consignment basis. When the Foundation auctioned items on consignment, the Foundation borrowed the consignment items from a consignment vendor and put those items up at auction. At the conclusion of the auction, the Foundation would pay the vendor the consignment price for any items that sold at auction and would return any items that did not sell.

4. Individual One, an individual known to the Acting United States Attorney, was the founder and owner of a charity auction business based in New York City ("Business A"). Business A, a business known to the Acting United States Attorney, conducted auctions for clients and offered consignment items, such as event tickets or sports memorabilia, to clients for use in their auctions. On occasion, the Foundation used the services of Business A to provide consignment items at auction.

5. The Foundation hired Accounting Firm One, an accounting firm known to the Acting United States Attorney, to issue checks for the Foundation, to record Foundation credit card expenses in QuickBooks (an accounting software program), and to create periodic financial reports for the Foundation. **GOODWIN** was the primary point of contact between Accounting Firm One and the Foundation, and it was her job to provide Accounting Firm One with the Foundation's credit card statements and expense reports so that Accounting Firm One could prepare the financial reports. Further, it was **GOODWIN**'s responsibility to provide the financial reports prepared by Accounting Firm One to the Foundation's CEO.

6. Beginning in or about July 2018, and continuing until in or about June 2020, in the Middle District of Tennessee and elsewhere, **GOODWIN** devised and intended to devise a scheme and artifice to defraud the Foundation, and others, known and unknown to the Acting United States

Attorney, and to obtain money and property by means of materially false pretenses, representations, and promises, and by acts of concealment of the scheme, and in furtherance thereof, used interstate wires, which scheme is further described in the following paragraphs.

7. While **GOODWIN** was employed at the Foundation, it had an active JPMorgan Chase corporate credit card account ending in account number x0241. Sometime before July 2018, **GOODWIN** obtained a Foundation credit card in her own name, credit card account ending in x1527, which was a sub-account of the Foundation credit card account ending in x0241.

8. Beginning in at least approximately July 2018, **GOODWIN** began using the Foundation credit card ending in x1527 to make large ticket purchases through online ticket and event vendors such as Ticketmaster, Stubhub, Primesport, and On-Location. Some of the tickets **GOODWIN** purchased were for musical concerts, such as Lady Gaga and Celine Dion, and some were to sporting events, such as Super Bowl LIV, which was a major sporting event that was scheduled to take place in Miami, Florida, on February 2, 2020. The tickets that **GOODWIN** purchased were not for a legitimate Foundation purpose.

9. It was part of the scheme that **GOODWIN** also used the Foundation's credit card to purchase other items that were not for legitimate Foundation purposes, such as expensive and rare alcohols, plane tickets, and hotel stays.

10. It was part of the scheme that after **GOODWIN** purchased the tickets at market resale value through online ticket and event vendors such as Ticketmaster, Stubhub, Primesport, and On-Location, she provided those tickets and some of the other items purchased with the Foundation's credit card to Individual One.

11. It was part of the scheme that **GOODWIN** led Individual One to believe she had acquired those tickets for free or at a discounted rate.

12. Between July 2018 and April 2020, **GOODWIN** purchased approximately $3.96 million in tickets from Ticketmaster, Stubhub, Primesport, and On-Location using the Foundation's credit card. Goodwin then used the Foundation bank accounts to make payments on the credit card.

13. It was part of the scheme that, in order to conceal the purchases and checks she wrote, **GOODWIN** provided falsified credit card statements and false expense reports to Accounting Firm One. Before providing them to Accounting Firm One, **GOODWIN** altered the credit card statements to conceal purchases she made from Ticketmaster, Stubhub, Primesport, and On-Location, as well as other expenses. She often replaced those expenses with other vendors so that the charges appeared to be legitimate Foundation expenses. In total, **GOODWIN** concealed over $3 million in fraudulent credit card expenses.

14. Accounting Firm One prepared the Foundation's periodic financial statements based on these falsified credit card statements and expense reports. Accounting Firm One then emailed those financial statements to **GOODWIN**, whose job it was to provide them to the Foundation's CEO.

15. It was further a part of the scheme that after receiving the financial statements from Accounting Firm One, **GOODWIN** falsified those financial statements before providing them to the Foundation's CEO. **GOODWIN** falsified the financial statements by inflating the Foundation's assets and lowering its liabilities to make the Foundation appear to be more liquid than it actually was at the time. For example, on the August 31, 2019, periodic financial statement, **GOODWIN** inflated the cash balance by $500,000, and on the 2019 Year-End Financials, **GOODWIN** inflated the cash balance by $1,020,000. These falsifications prevented the Foundation from detecting **GOODWIN's** fraudulent transactions.

16. It was further a part of the scheme that **GOODWIN** caused payments to be made to the Foundation's credit card from Business A's bank account related to the tickets she purchased as part of the scheme.

17. It was further a part of the scheme that **GOODWIN** forged the signature of the Foundation's CEO on various Foundation checks. **GOODWIN** did not have authority to sign Foundation checks. The Foundation had a policy that any check over $5,000 must be signed by at least two signatories—the Foundation's CEO and the Foundation's in-house counsel. Despite this, **GOODWIN** signed the CEO's name on several checks that were not approved by the Foundation. **GOODWIN** forged the CEO's name on the following checks without authorization or approval:

| Check Date | Payable to | Check Amount |
|---|---|---|
| 05/23/2019 | Business A | $12,500.00 |
| 02/06/2020 | Business A | $122,211.00 |
| 02/13/2020 | Business A | $600,950.00 |
| 02/21/2020 | Business A | $34,530.00 |
| 03/11/2020 | Business A | $119,652.28 |
| 03/23/2020 | Business A | $76,432.50 |

18. On or about the April 11, 2020, in the Middle District of Tennessee and elsewhere, **GOODWIN**, for the purpose of executing and attempting to execute the scheme to defraud, caused to be transmitted by means of wire communications in interstate commerce the following signals and sounds: an email dated April 11, 2020, to S.S., an employee at Accounting Firm One, which contained falsified credit card statements that omitted payments to the credit card from Business A's bank account and falsified and concealed other fraudulent expenses **GOODWIN** had incurred on the Foundation's credit card, in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATION

19. Paragraphs One (1) through Eighteen (18) are reincorporated and realleged as if fully set forth herein in support of this forfeiture.

20. Upon conviction of Count One of this Information, **MELISSA ANN GOODWIN** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) by Title 28, United States Code, Section 2461, any property constituting, or derived from, proceeds traceable to the violation of Title 18, United States Code, Section 1343 as charged in Count One, including but not limited to a money judgment in the amount of at least $3,765,606.77 United States currency, representing the proceeds of the scheme and artifice to defraud as set forth in the Count One.

21. If any of the property described above, as a result of any act or omission of **GOODWIN**:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of **GOODWIN**, up to the value of said property listed above as subject to forfeiture up to the amount of $3,765,606.77 United States currency.

                                        MARK H. WILDASIN
                                        UNTIED STATES ATTORNEY

                                        */s/ Katy Booth*
                                        KATHRYN W. BOOTH
                                        ASSISTANT UNITED STATES ATTORNEY